## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

BURTON W. WIAND, as Receiver for
TRI-MED CORPORATION,

     Plaintiff,                    Case No.:

v.

RICHARD PAUL WILLIAMS, KRISTINE D.
WILLIAMS and APEX CHIROPRACTIC of
CHAMPLIN PLLC,

     Defendants.

_____/

## COMPLAINT

Burton W. Wiand (the "**Receiver**"), as Receiver[1] for Tri-Med Corporation ("**Tri-Med**"), by and through his undersigned counsel, hereby files suit against Dr. Richard Paul Williams ("**P. Williams**"), Kristine D. Williams ("**K. Williams**"), and Apex Chiropractic of Champlin PLLC ("**Defendant Apex**" and, collectively with P. Williams and K. Williams, "**Defendants**") and alleges as follows:

## INTRODUCTION

1.     Mr. Wiand was appointed as Receiver for Tri-Med by the Circuit Court for the Sixth Judicial Circuit in Pinellas County, Florida (the "**Florida Court**"), in an Order dated March 5, 2014 (the "**Order Appointing Receiver**").

---

[1]     By orders dated March 5, 2014, May 13, 2014, September 30, 2015, and December 11, 2015, Mr. Wiand also was appointed Receiver for Tri-Med Associates Inc. ("**TMA**"), TMFL Holdings, LLC ("**TMFL**"), Interventional Pain Center, PLLC ("**IPC**"), and Rejuva Medical and Wellness Center, L.L.C., and Rejuva Medical Center, L.L.C. (collectively, "**Rejuva**") (Tri-Med, TMA, TMFL, IPC, and Rejuva are collectively referred to as the "**Receivership Entities**"), but he sues only on behalf of Tri-Med.

1

2.      The Florida Court entered the Order Appointing Receiver in an enforcement action brought by Florida's Office of Financial Regulation ("**OFR**") styled, *State of Florida, Office of Financial Regulation v. Tri-Med Corp., et al.,* Case No. 14-001695-CI (the "**OFR Proceeding**"), which was brought pursuant to Florida Statutes Chapter 517.  The OFR alleged that the OFR Proceeding defendants operated a fraudulent investment scheme through Tri-Med (and other entities) that raised at least $14 million from several hundred mostly elderly Florida investors.  A true and correct copy of the Order Appointing Receiver is attached hereto as **Exhibit A**.

3.      The Receiver was appointed pursuant to Florida Statutes Section 517.191(2) and the Florida Court's inherent equity powers, including the powers to carry out the purposes of the OFR Proceeding.

4.      Under the Order Appointing Receiver, to carry out OFR's mandates, the purposes of the OFR Proceeding, and the obligations and duties imposed on receivers by law, the Receiver was directed to, among other things, hold and manage the assets and property of the Receivership Entities and marshal and safeguard all such properties and assets and seek constructive trusts as appropriate.  He also was conferred the power and authority to assert and prosecute claims, actions, suits, and proceedings which may have been or which may be asserted or prosecuted by Receivership Entities.

5.      This action is filed to recover damages for Tri-Med from Defendants based on their participation in a fraudulent scheme orchestrated by, among others, Jeremy Anderson ("**Anderson**"), Anthony Nicholas, Jr. ("**Nicholas Jr.**"), and Anthony Nicholas, III ("**Nicholas III**) (collectively, the "**Tri-Med Principals**").  The Receiver also brings this action to recover

money transferred to Defendants, which originated from Tri-Med and, in turn, from Tri-Med's defrauded investors.

## JURISDICTION AND VENUE

6.     The Receiver was appointed in the OFR Proceeding, which is pending in the Circuit Court for the Sixth Judicial Circuit in Pinellas County, Florida.  He is a citizen of and resides in the State of Florida.

7.     Defendant P. Williams is a citizen of and resides in the State of Minnesota.

8.     Defendant K. Williams is a citizen of and resides in the State of Minnesota.

9.     Defendant Apex is a professional limited liability company registered in the State of Minnesota and its principal place of business is located in Hanover, Minnesota.   Upon information and belief, Defendant Apex is inactive.  Defendant P. Williams is a member of Apex and is a citizen of and resides in the State of Minnesota.

10.     Jurisdiction is proper under 28 U.S.C. § 1332 because there is complete diversity with respect to these claims, and the matter in controversy exceeds $75,000, exclusive of interest, costs, and attorney's fees.

11.     Venue is proper under 13 U.S.C. § 1391 because Defendants are residents of this judicial district and a substantial part of the events giving rise to this action occurred within this judicial district.  As such, the causes of action asserted in this case accrued in Minnesota.

## THE PARTIES

12.     Mr. Wiand is the duly appointed and acting Receiver for the Receivership Entities.  The Receivership Entity on whose behalf the Receiver asserts the claims in this case is Tri-Med.

13.     Non-parties Anderson, Nicholas, III, Nicholas, Jr., Eric Ager, Irwin Ager, and Teresa Simmons Bordinat, a/k/a Teresa Simmons (collectively, the "**Insiders**"), along with others, used the Receivership Entities to defraud approximately 230 investors from at least October 2011 forward by making material misrepresentations and omissions to lure investors into their fraudulent investment scheme.   The Insiders have refused to answer substantive questions and invoked their Fifth Amendment right against self-incrimination during depositions taken in connection with OFR's enforcement action.

14.     Defendant P. Williams is a chiropractic doctor and business partner of Anderson in Minnetonka, Minnesota. Anderson was the owner of Tri-Med Management ("**TMM**"), which was an unrelated business operated by Defendant P. Williams and Defendant K. Williams. Defendant K. Williams is Defendant P. Williams' wife.  She was the Chief Financial Officer of TMM.

15.     As alleged below, in connection with the fraudulent investment scheme, Anderson caused Tri-Med to transfer $350,000 to Defendant P. Williams for the purported purpose of purchasing medical receivables from Defendant P. Williams and/or Defendant P. Williams' medical clinic.   The medical receivables, however, did not exist and the supporting documentation was forged.  As such, Anderson, with the assistance of Defendant P. Williams, knowingly and intentionally stole money from Tri-Med and caused Tri-Med to transfer it to Defendant P. Williams or for P. Williams' benefit.

16.     Anderson, Defendant P. Williams, and Defendant K. Williams used these monies for improper purposes, including to operate TMM and to renovate Defendant P. Williams and K. Williams' home.  Defendant K. Williams, as Chief Financial Officer of TMM, knew or should

have known about the monies from Tri-Med being deposited into TMM's account.   She also executed many of the checks from TMM's account, including those to renovate their home.

17.     In at least one instance, Defendant P. Williams subsequently transferred some of the money he received from Tri-Med to his entity, Defendant Apex.   Upon information and belief, Defendant K. Williams also received transfers of property from TMM and/or Defendant P. Williams.

## THE FRAUDULENT SCHEME

### A.     Background

18.     From 2011 through March 2014, over $17 million was raised from over 230 investors on behalf of Tri-Med by the Insiders and others through the offer and sale of securities as part of a single and continuous fraudulent scheme (the "**scheme**").  They misappropriated the vast majority of that money, including for their and others' personal benefit.

19.     Following a lengthy evidentiary hearing on October 22, 2014, the Florida Court overseeing the OFR Proceeding found that the evidence was "**highly suggestive of numerous criminal offenses that [the Insiders] might be fearful of from tax evasion to securities violations to fraud and theft, et cetera, et cetera**."  The Florida Court concluded that "**the evidence is clear and convincing and reaches a very high level that this was a fraudulent scheme to steal people's money**."  In September 2016, Insiders Irwin Ager and Eric Ager pled guilty to criminal charges and admitted the scheme.

20.     The Tri-Med investment scheme essentially involved the purported purchase of medical accounts receivable generated from treatment of accident victims.  For example, a person injured in a car accident will sometimes retain a personal injury attorney, seek medical treatment from a doctor that focuses on treating accident victims, try to negotiate a settlement for

personal injury benefits under the victim's own auto insurance policy and/or for payment under the insurance policy of any other person involved in the accident, and then file a lawsuit, if necessary. The doctor accrues a receivable in the amount charged for the treatment provided to the injured patient and obtains a letter of protection ("**LOP**"). An LOP is a contract involving the patient, the patient's attorney, and the medical services provider pursuant to which the patient and attorney agree to pay all or part of the total billed by the medical services provider from the proceeds of any pre-suit settlement, lawsuit settlement, or judgment the patient may obtain in connection with the accident.

21.     As part of their investment scheme, the Insiders claimed to purchase LOPs on behalf of Tri-Med at purported discounts to their face values from accident injury clinics and other medical service providers. This allowed the providers to be paid some amount of money without waiting for the resolution of the patients' insurance claims or litigation. Tri-Med purportedly accomplished such purchases through a document referred to as an "Assignment of Medical Receivables."

22.     Tri-Med raised money from investors to purportedly purchase LOPs by issuing securities. Tri-Med Associates, Inc. ("**TMA**"), was the so-called "marketing arm" of Tri-Med and focused on soliciting investors to purchase Tri-Med securities. Insiders purposely targeted the elderly and fraudulently likened Tri-Med securities to certificates of deposit to make it seem like a very safe option for people seeking a fixed-income investment. In return for an investment in Tri-Med, each investor was promised (1) an assignment of at least one LOP, depending on the amount of the investment; (2) payment to the investor of "interest" ranging from 5.75% to 8%; and (3) the return of the investor's principal investment once the medical receivable backed by

the LOP purportedly assigned to that investor was paid or at the expiration of two years, whichever occurred first.

23.     During the scheme, Tri-Med's attorneys provided to Insiders a comprehensive memorandum that clearly notified Insiders they were violating state and federal securities laws. The memorandum notified Insiders they were violating securities laws by, among other things, not providing full and fair disclosure of information to investors; making inaccurate or misleading representations; advertising the Tri-Med "investment program" in newspapers and on Tri-Med's website; failing to register the securities and certain entities and individuals; and paying unlawful commissions.

24.     In fact, this memorandum bluntly notified Insiders that:

> **Tri-Med and its principals have potential exposure to liability for claims by purchasers, as well as exposure for sanctions by Federal securities regulators.**

It also explained that:

> **[u]ntil the Investors are repaid in full, the only way to eliminate the potential claims by purchasers would be to conduct a rescission offer to all prior purchasers who purchased** [investments from Tri-Med].

25.     The memorandum also warned that, "**Florida securities regulators could impose sanctions, require a rescission offer or pursue other civil or criminal liabilities….**"

**B.     Investors Relied Upon Various Material Misrepresentations And Omissions In Connection With Their Purchase Of Tri-Med Securities**

26.     Insiders made various material misrepresentations and omissions to investors in connection with Tri-Med.  Insiders misrepresented to investors and potential investors on Tri-Med's website, in investor agreements, and in flyers that the Tri-Med investment was "registered with and operates as an exempt security, as reviewed by the [OFR]" or similar false language.

Tri-Med securities were never registered with OFR, and OFR has never given any indication that they were exempt from registration.

27.     Insiders also included a "legal opinion letter" purportedly authored by an attorney from the Florida law firm Broad & Cassel in the materials they used to solicit investors.  This letter purports to provide a legal opinion that the Tri-Med securities offered and sold by Insiders were exempt from registration with Florida and federal securities regulators.  This letter, however, is a forgery and neither Tri-Med nor any Insider was ever a client of Broad & Cassel.

28.     Similarly, Insiders provided a document entitled "Legal Principals of Trimed Corporation" to potential investors, in which they claimed "John A. Schifino" served as Tri-Med's "Securities Attorney."  Not only does Attorney Schifino not practice securities law, but he has never represented Tri-Med or any of the Insiders in any capacity.   Additional material misrepresentations and omissions were made to investors and potential investors.

29.     Non-party Stephen Marlowe and his firm, Marlowe McNabb Machnik, P.A. (f/k/a Marlowe McNabb, P.A.) (collectively, "**Marlowe**"), were responsible for holding investors' money in trust pending the purchase of LOPs.  At the inception of the scheme, Marlowe wrote a letter to Tri-Med in which he represented that "[a]ll funds received by or through Tri Med from investors will be deposited into a Marlowe McNabb Trust Account established for this purpose" and that Marlowe McNabb would "pay medical providers for the LOPs."  Tri-Med provided that letter to investors, and investors relied on Marlowe's representations, among other representations and omissions, in making their investment decisions.  In other similar letters, Tri-Med told investors that "your funds have been placed in an FDIC Insured Trust Account under the control and direction of one of Florida's most respected law firms, Marlowe McNabb P.A…."

30.     During the entirety of the scheme, however, only approximately $2.8 million of the more than $17.6 million raised from investors was deposited in trust with Marlowe.  Insiders diverted the vast majority of the money invested in Tri-Med for their personal and others' benefit.

31.     Tri-Med purportedly assigned LOPs to investors through a document referred to as an "Assignment of Interest" certificate.  Every Tri-Med investor received at least one of these certificates.  Each Assignment of Interest certificate identified (1) the LOP the investor's funds purportedly were used to purchase, which was identified by an alphanumeric code; (2) the purported value of the LOP or interest therein; and (3) the name of the insurance company that purportedly guaranteed the underlying medical receivable.

32.     Further, those certificates represented to investors that each letter of protection "**ACTS AS AN INDISPUTABLE LIEN UPON THE INDIVIDUAL CASE IT REPRESENTS**" (original emphasis).  As a matter of law, however, the certificates did not constitute valid assignments because, among other reasons, the investors never took ownership of the underlying LOP.  As such, that representation to investors was false.

33.     To underscore the purported safety of the Tri-Med securities, the certificates also represented that the LOPs were "secured," "guaranteed," or "backed" by major insurance companies.  In reality, the LOPs were not secured, guaranteed, or backed by anything.  The LOPs were merely agreements between medical providers, patients, and their attorneys that gave the medical providers some right to receive payment for all or part of their services from any money patients might receive in connection with settlements or judgments.  As such, this representation to investors also was false.

34.     In some cases, investors received Assignment of Interest certificates that purported to assign LOPs that did not even exist.  Insiders and others prepared and signed these certificates.  Insiders fabricated dozens of LOPs, and instead of purchasing medical receivables, they used investors' money to enrich themselves and others, purchase real estate, and fund unrelated business ventures, including IPC, Rejuva, and TMM.  Again, these representations to investors were false.

### C.     Insiders Used Investor Funds For Improper And Undisclosed Purposes

35.     Tri-Med used $500,000 of investor funds to make a loan in June 2012 to Spine Pain Management, Inc. ("**SPIN**"), through a 12% convertible promissory note with a maturity date of March 27, 2014.  Tri-Med subsequently entered into an amended 12% convertible promissory note with SPIN in early 2014 that extended the maturity date of the loan to March 27, 2015.

36.     At the time of the loan, Tri-Med had raised almost $3 million from investors based upon representations that it would use the investors' money to purchase LOPs.  Instead, the insiders used money from dozens of investors to fund the $500,000 loan to SPIN, and to conceal their fraud, the Insiders issued those investors at least 50 "assignments" of fabricated LOPs.  Tri-Med was not in the lending business and intentionally failed to disclose to investors that their money would be used to make loans to unrelated companies.

37.     In April 2013, Tri-Med loaned $450,000 to Spine Injury Physicians, LLC ("**SIP**"), and related entities, including Wellness Worx Center, PLLC ("**Wellness Worx**"), and Visum Management, LLC ("**Visum**") (collectively, the "**SIP Entities**").  Tri-Med also purchased approximately $80,000 of medical equipment for the SIP Entities.

38.     Insiders used money from dozens of investors to fund the loan and equipment they gave the SIP Entities, and to conceal their fraud, the Insiders issued those investors at least 30 "assignments" of fabricated LOPs.

39.     Even when Tri-Med actually purchased LOPs, many of them prohibited the relevant medical provider from transferring or assigning them to Tri-Med or Tri-Med's investors and others were also sold to other funding sources.  Investors were not informed of these facts. Nevertheless, the certificates purported to assign these "double-sold" LOPs to investors.

40.     In April 2013, Anderson caused Tri-Med to enter into a joint venture agreement with GP-13 Enterprises, PLLC ("**GP-13**"), to purchase and renovate homes in Florida for the purpose of hopefully reselling those same homes at a profit.  Anderson funded the joint venture with more than $574,000 he misappropriated from Tri-Med and its investors.  The joint venture used that money to buy three residential properties.  GP-13 did not contribute any capital to the joint venture, but according to the joint venture agreement, it was entitled to split any profits equally with Tri-Med.   Tri-Med was not in the real estate business and its investors were not told any of their funds would be used to purchase real estate.

41.     In connection with the fraudulent scheme, Anderson and other Insiders misappropriated funds from Tri-Med for their own personal use.  For example, Anderson stole $250,000 from Tri-Med to fund a personal investment in a now-defunct restaurant in Alpharetta, Georgia, called Kickshaw Japanese Style Tavern through Balance Restaurant Group, LLC (the "**Balance Group**").  On August 13, 2013, Anderson wired $250,000 from Tri-Med's operating account (ending in 0065) at Wells Fargo Bank to the Balance Group's account (ending in 1804) at Bank of America.  The next day, the Balance Group transferred $50,000 of that amount to Receivership Entity IPC – another entity controlled by Anderson – leaving the Balance Group

with a total of $200,000 from Tri-Med that funded Anderson's purported loan and capital contribution evidencing his personal investment.  On February 19, 2014, Anderson transferred an additional $50,000 to the Balance Group through a check from a second Tri-Med account (ending in 0107) at Wells Fargo Bank.

42.     Anderson also improperly funded other entities with proceeds from Tri-Med.  For example, IPC was funded entirely with money derived from the scheme. Anderson caused Tri-Med to transfer more than $1 million to IPC during September 2013 to February 2014 for the purported purpose of purchasing medical receivables.   Anderson also caused Tri-Med to make an improper transfer of $300,000 to IPC on the day the court in the OFR Proceeding entered the Order Appointing Receiver, which included an asset freeze.  Tri-Med, however, never received any monies in connection with these purported sales.  Instead, Anderson converted these funds for his own use.

### D.     Insiders Operated A Ponzi Scheme Through Tri-Med

43.     Insiders operated a Ponzi scheme through Tri-Med by raising money from investors through material misrepresentations and omissions, failing to utilize investor funds as promised, misappropriating the majority of investor funds for their own personal benefit, and making purported "interest" payments with investor funds.

44.     Tri-Med operated for approximately ten months before it generated any revenue from the actual purchase of medical accounts receivable.  Insiders never disclosed this material fact to any actual or potential investors.  As such, virtually all expenses, "distributions" to principals, and "distributions" to investors during that time period were paid from investors' principal.  Tri-Med raised over $3.5 million from investors during those initial ten months, but only $826,000 was deposited in Marlowe McNabb's trust account, and Tri-Med only used

$627,000 of that amount to buy LOPs.  The Insiders misappropriated and diverted the majority of the investors' funds.

45.     For example, Tri-Med received $90,000 from its first investor on November 16, 2011.  During the 21-day period following this investment, none of those funds were deposited with Marlowe or used to purchase medical accounts receivable.  Instead, approximately $51,000 of the initial investment was misappropriated and diverted as follows: (1) $22,650 to Anderson directly; (2) $7,200 for Anderson's rental of Unit 1520 at the Ivy, a luxury residence in Minneapolis, Minnesota; (3) ATM withdrawals totaling $830, primarily at The Ivy; (4) $1,269.91 to Fields BMW in Lakeland, Florida, to pay for Anderson's BMW; (5) $332.75 to StubHub, an online marketplace for tickets to sporting and entertainment events; (6) $13,500 to TMA for commission payments; and (7) $6,000 to Insider Anthony N. Nicholas III.

46.     Even though Tri-Med had not made any investments in medical accounts receivable or made any "profits," the Insiders caused Tri-Med to pay "interest" in the amount of $600 to the first investor on November 30, 2011.  This payment was made from the investor's own funds.  During the time period of October 2011 to July 2012, the Insiders caused Tri-Med to distribute over $80,000 to investors as "interest" payments.  Using investors' money to pay purported investment returns is a classic hallmark of a Ponzi scheme.

47.     Investor funds should have been used for the stated purpose of Tri-Med's business, which was to purchase LOPs at a favorable discount and use the proceeds from the LOPs' maturation to pay returns to investors.

48.     However, the vast majority of investors' money was not used to purchase LOPs. Instead, Insiders misappropriated a majority of investor funds for their own benefit and other unauthorized purposes.

49.    Tri-Med and other Receivership Entities were harmed by this unauthorized course of conduct, which was effectuated in furtherance of the scheme.

**E.    Certain Insiders Plead Guilty For Their Role in the Tri-Med Scheme**

50.    Insiders were notified in 2014 that they were the target of a federal criminal investigation as a result of their participation in the Tri-Med scheme.

51.    On September 13, 2016, the U.S. Attorney's Office for the Middle District of Florida filed in the Orlando Division of the U.S. District Court for the Middle District of Florida the first criminal information and plea agreements addressing the scheme underlying this case. *See United States v. I. Ager,* Case No. 6:16-cr-176-ORL-18DAB, *and United States v. E. Ager,* Case No. 6:16-cr-178-ORL-37TBS.  Those initial criminal cases were filed against Insiders Irwin Ager and Eric Ager.  In pleading guilty, the Agers admitted that they and co-conspirators perpetrated the fraudulent investment scheme underlying, and as alleged in, this case.

## ANDERSON DEFRAUDED TRI-MED BY PURCHASING NON-EXISTENT MEDICAL ACCOUNTS RECEIVABLES FROM DEFENDANT P. WILLIAMS

52.    Beginning in 2012, Anderson defrauded Tri-Med by causing it to purchase non-existent medical accounts receivables.  To accomplish this, Anderson created and forged documents, including by forging patient and attorney signatures, to create the appearance that Tri-Med was purchasing real medical receivables, including from Defendant P. Williams and/or Defendant P. Williams' medical clinic.

53.    As detailed in Exhibit B attached hereto and incorporated herein, Anderson, with the assistance of Defendant P. Williams, caused Tri-Med to transfer at least $350,000 to Defendant P. Williams or for his benefit from December 6, 2012, to April 25, 2013, for the purported purchase of medical accounts receivable (collectively, the "**Transfers**").  Anderson

knew that the accounts receivable purportedly sold by Defendant P. Williams to Tri-Med did not exist and were created solely for the purpose of trying to mask unlawful transfers of money from Tri-Med and defrauding Tri-Med and its investors.

54.     Defendant P. Williams knew that the medical receivables were non-existent. Indeed, Defendant P. Williams did not have the ability or authority to sell medical receivables.

55.     Each of the Transfers was made through checks payable to Defendant P. Williams.  Defendant P. Williams accepted and endorsed each such check written from Tri-Med to him.  Each of the checks underlying the Transfers explicitly falsely noted on its face that the payment was for purchasing medical receivables.

56.     Defendant P. Williams deposited the Transfers into accounts he controlled, including accounts held in the names of Defendant Apex and TMM.   With respect to the Transfers he deposited into the Apex account, Defendant P. Williams subsequently transferred that money to TMM, an entity controlled by Anderson, Defendant P. Williams, and Defendant K. Williams.

57.     Defendant P. Williams, Defendant K. Williams, and Anderson then misappropriated the Transfers for a series of improper purposes to benefit themselves or entities in which they had an interest, including the operation of an unrelated business Defendant P. Williams managed with Anderson and to fund renovations on Defendant P. Williams' and K. Williams' personal residence in Minnesota.   Defendant P. Williams also received cash payments from TMM.  Upon information and belief, Defendant K. Williams also received cash payments from TMM and Defendant P. Williams.

   **A.     Anderson Caused Tri-Med To Fraudulently Transfer $200,000 To Defendant**

58.     On December 5, 2012, Tri-Med and Defendant P. Williams purportedly entered into an agreement wherein Tri-Med purchased five "Assignment of Medical Receivables" (collectively, the "**2012 Assignments**") from Defendant P. Williams.  Defendant P. Williams purported to sell a total of $573,000 of outstanding medical receivables to Tri-Med for $200,000. Each of the 2012 Assignments contained purported supporting documentation that included purported correspondence from the patient's attorney to Defendant P. Williams confirming that the charges were valid and would be supported.    Each of the 2012 Assignments, however, was forged.

59.     For example, one of the 2012 Assignments, Assignment of Medical Receivables (CA-237), purported to assign $129,000 of outstanding medical charges for patient S.T. from Defendant P. Williams to Tri-Med.  Attached as Exhibit A to Assignment CA-237 is a letter dated May 21, 2012, from Melissa K. Draack (the "**Draack Letter**") with the law firm of Martineau, Gonko & Vavreck, PLLC ("**MGV**"), to Defendant P. Williams indicating that Ms. Draack's office represented S.T. and would "protect your interest in this case," and requesting a statement setting forth the nature of the treatment and attesting that the treatment was medically necessary.

60.     In an affidavit provided by Christopher J. Gonko, a shareholder with MGV, Mr. Gonko attested that (i) Melissa Draack is not an attorney with MGK and would not have been allowed to sign any such letter; (ii) patient S.T. was never a client of MGV; and (iii) the Draack Letter was a forgery.  Melissa Draack also executed an affidavit attesting that she did not sign the Draack Letter.

61.     On December 6, 2012, Anderson caused a $200,000 check (the "**$200,000 Check**") to be written on a Tri-Med bank account at Wells Fargo Bank, N.A.  The $200,000

Check was payable to "Dr Paul Williams," and contained a notation in the memo portion of the check stating "5 ASSIGNMENTS OF MED RECEIVALBES [sic]."   The $200,000 Check also contains an address for Defendant P. Williams, which upon information and belief, was an address for Defendant Williams' chiropractic clinic, West End Wellness.  Defendant P. Williams deposited the $200,000 Check into Apex's account, which he controlled, and then subsequently transferred those funds to TMM.  Defendant Williams knew that these funds were not for the purpose of purchasing medical accounts receivable.

62.   In January 2013, Defendant P. Williams obtained a cashier's check for $20,000 from TMM's account.   Beginning in February 2013, Defendant K. Williams executed checks from TMM's account for various purposes, including cash payments to Defendant P. Williams, renovating their home, and funding other businesses.  Upon information and belief, Defendant K. Williams also received payments from TMM and/or Defendant P. Williams. These payments were made as a result of the $200,000 misappropriated from Tri-Med in December 2012.

**B.     Anderson Caused Tri-Med To Fraudulently Transfer Another $100,000 To Defendant**

63.   On March 19, 2013, Tri-Med and Defendant P. Williams purportedly entered into an agreement wherein Tri-Med purchased four "Assignment of Medical Receivables" (collectively, the "**2013 Assignments**") from Defendant P. Williams.  Defendant P. Williams purported to sell a total of $327,333.36 of outstanding medical receivables to Tri-Med for $100,000.  Each of the 2013 Assignments contained purported supporting documentation that included correspondence from the patient's attorney to Defendant P. Williams confirming that the charges were valid and would be supported.   Each of the 2013 Assignments, however, was forged.

64.     For example, Assignment of Medical Receivables (CA-411) purported to assign $100,000.02 of outstanding medical charges for patient M.T. from Defendant P. Williams to Tri-Med.   Attached as Exhibit A to Assignment CA-411 was a "Letter of Protection" on the letterhead of Defendant P. Williams' company, West End Wellness, executed on October 4, 2012 by patient M.T. and M.T.'s attorney (the "**M.T. Letter of Protection**").  The M.T. Letter of Protection provided, in relevant part, that M.T. would be "directly and fully responsible to West End Wellness / Dr. Paul Williams for all bills for services rendered to me."

65.     The M.T. Letter of Protection was a forgery.  In an affidavit provided by James R. Schwebel, the purported attorney for patient M.T., Attorney Schwebel attested that (i) he is not the attorney for patient M.T. nor is he familiar with that person and (ii) he is not familiar with nor did he sign the M.T. Letter of Protection.

66.     On March 20, 2013, Anderson caused a $100,000 check (the "**$100,000 Check**") to be written on a Tri-Med bank account at Wells Fargo Bank, N.A.  The $100,000 Check was payable to "Dr Paul Williams," and contained a notation in the memo portion of the check stating "4 ASSIGNMENTS OF MED RECEIVALBES [sic]."   The $100,000 Check also contained an address for Defendant P. Williams, which upon information and belief, was an address for Defendant P. Williams' chiropractic clinic, West End Wellness.   Defendant P. Williams subsequently endorsed the check and deposited these funds into TMM's account. Defendant P. Williams knew that these funds were not for the purpose of purchasing medical accounts receivable.

**C.     Anderson Caused Tri-Med To Fraudulently Transfer Another $50,000 To Defendant Williams**

18

67.     An undated "Assignment of Medical Receivables" (the "**Undated Assignment**") was prepared between Tri-Med and Defendant P. Williams that purported to sell $166,667.00 of outstanding medical receivables from Defendant P. Williams to Tri-Med for $50,000.   The Receiver is not in possession of a signed copy of the Undated Assignment and does he have any record of the patient referenced in the Undated Assignment.   However, upon information and belief, the Undated Assignment was forged by Anderson.

68.     On April 25, 2013, Anderson caused a $50,000 check (the "**$50,000 Check**") to be written on a Tri-Med bank account at Wells Fargo Bank, N.A.   The $50,000 Check was payable to "Dr Paul Williams," and contained a notation in the memo portion of the check stating "BUY OF AN ASSIGNMENT OF MED RECEIVALBES [sic]."   The $50,000 Check also contained an address for Defendant P. Williams, which upon information and belief, was an address for his chiropractic clinic, West End Wellness.   Defendant P. Williams subsequently endorsed the check and deposited these funds into TMM's account.   Defendant P. Williams knew that these funds were not for the purpose of purchasing medical accounts receivable.

69.     Anderson, with the assistance of Defendant P. Williams, defrauded Tri-Med by engaging in the scheme and forging the Assignments and purported supporting documents in order to create the appearance that the $350,000 from Tri-Med to Defendant P. Williams was consideration for the purchase of valid and existing medical receivables.       Defendant P. Williams knowingly and intentionally provided substantial assistance to Anderson in connection with the scheme by, at a minimum, endorsing and depositing the Transfers into accounts he controlled.   The Transfers were then used by Anderson, Defendant P. Williams, and Defendant K. Williams for their benefit, including for operating TMM and renovating Defendants' home.

70.     There was no value, benefit, or services provided to Tri-Med in exchange for any of the Transfers.   Tri-Med never received or recouped any proceeds from any medical receivables for the Transfers and thus has been harmed and damaged at least in the amount of the $350,000 transferred to Defendant P. Williams.   A portion of these monies were subsequently transferred to Defendant Apex and, upon information and belief, to Defendant K. Williams.

71.     All money Anderson and the other Insiders wrongfully caused Tri-Med to transfer to Defendant P. Williams was diverted and misappropriated in furtherance of the scheme.   Thus, all of the money transferred to Defendant P. Williams was improperly diverted assets of Tri-Med.

## COUNT I
**Minnesota Statutes § 513.44: Uniform Fraudulent Transfer Act – All Defendants**

72.     The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 71.

73.     By intentionally and wrongfully causing the transfer of money as identified in Exhibit B from Tri-Med to Defendant P. Williams and/or for his benefit under the circumstances alleged in this complaint, Tri-Med, through the Receiver, has a right to repayment of at least that amount from Defendant P. Williams.

74.     In light of this right to repayment (and independently because the Insiders' conduct as alleged in this complaint with respect to Tri-Med amounted to embezzlement, breach of fiduciary duty, fraud, and/or other violations of law), Tri-Med has a claim against the Insiders and consequently is a creditor of the Insiders under MUFTA.   Accordingly, the Insiders are debtors under that act.

75.     The transfers of money that Insiders caused Tri-Med to make to Defendant P. Williams were inherently fraudulent because the transfers were made as part of the scheme.  The transfers were also inherently fraudulent because the medical receivables did not exist and the supporting documentation had been fabricated and forged.

76.     Those transfers were fraudulent under Minnesota Statutes § 513.44(a)(1) because the Insiders caused Tri-Med to make the transfers with actual intent to hinder, delay, or defraud creditors of the Insiders and Tri-Med.

77.     The Insiders' actual intent to hinder, delay, or defraud creditors of the Insiders and Tri-Med can also be established under Minnesota Statutes § 513.44(b) because many badges of fraud were present.  For example, (a) Anderson was an insider of Tri-Med; (b) Anderson retained control of the property transferred after the transfer through his co-control of TMM; (c) the fraudulent nature of the transfers was concealed from and not disclosed to Tri-Med or its investors; and (d) Tri-Med was insolvent or became insolvent shortly after each transfer was made by virtue of the fraudulent investment scheme perpetrated by Insiders.

78.     Those transfers also were fraudulent under Minnesota Statutes § 513.44(a)(2) because: (a) Insiders caused Tri-Med to make those transfers; and (b)(i) Insiders and Tri-Med were engaged or were about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction; or (ii) Insiders intended that they and/or Tri-Med incur, or believed or reasonably should have believed they would incur, debts beyond their ability to pay as they became due.

79.     Those transfers also were fraudulent under Minnesota Statutes § 513.45(a) because neither Insiders nor Tri-Med received a reasonably equivalent value in exchange for

those transfers to Defendant P. Williams, and the Insiders and Tri-Med were insolvent at all relevant times.

80.     Defendant P. Williams subsequently transferred $200,000 to Defendant Apex in or about December 2012.   Defendant Williams, using Defendant Apex's bank account, transferred these funds to TMM.

81.     Upon information and belief, TMM and Defendant P. Williams subsequently transferred monies it/he received from Tri-Med to Defendant K. Williams.

82.     On behalf of Tri-Med, from which money was (1) transferred to Defendant Williams or for his benefit; (2) subsequently transferred by Defendant P. Williams to Defendant Apex and/or (3) subsequently transferred by TMM or Defendant P. Williams to Defendant K. Williams, the Receiver is entitled to avoid and recover transfers equal to the transfers that Insiders caused Tri-Med to pay to Defendants (and to any other pertinent remedy, including those available under Minnesota Statutes § 513.47).

WHEREFORE, the Receiver asks this Court to enter a joint and several judgment against Defendants avoiding transfers from Tri-Med in the amount received by Defendants, together with interest and costs, and for such other and further relief as the Court may deem just and proper.

## COUNT II
### Unjust Enrichment – Defendants P. Williams and K. Williams

83.     The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 71.

84.     This unjust enrichment claim is asserted in the alternative, in the event the statutory remedy asserted in Count I does not provide an adequate remedy at law.

85.     Defendant P. Williams received a benefit when in furtherance and during the course of the scheme, Insiders wrongfully caused Tri-Med (as indicated in Exhibit B) to transfer money to Defendant P. Williams in an amount equal to the transfers received by Defendant P. Williams.  Upon information and belief, a portion of these monies were transferred to Defendant K. Williams in cash and property, including in the form of improvements to their home.

86.     Defendant P. Williams and K. Williams knowingly and voluntarily accepted and retained a benefit in the form of that money and benefits.

87.     The circumstances alleged in this complaint render Defendant P. Williams' and Defendant K. Williams' retention of those benefits inequitable and unjust so Defendant P. Williams and Defendant K. Williams must pay the Receiver, acting on behalf of Tri-Med, the value of the benefits received.

88.     Defendant P. Williams and Defendant K. Williams have been unjustly enriched at the expense of Tri-Med in the amount of the transfers received by Defendant P. Williams as detailed in Exhibit B, and those transfers and other property received by Defendant K. Williams, and Tri-Med, through the Receiver, is entitled to judgment in that amount.

89.     The Receiver, on behalf of Tri-Med, is entitled to the return of that money through disgorgement or any other applicable remedy.

90.     WHEREFORE, the Receiver asks this Court to enter a joint and several judgment against Defendant P. Williams and K. Williams in the amount of transfers received by Defendant P. Williams and Defendant K. Williams from Tri-Med, together with interest and costs, and for such other and further relief as the Court may deem just and proper.

## COUNT III

**Aiding, Abetting, or Participation in Fraud – Defendant P. Williams**

91.     The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 71 of this Complaint as if set forth fully herein.

92.     Anderson and his co-conspirators engaged in a fraudulent scheme through Tri-Med.  They raised money from investors under false pretenses and then stole that money for their personal and others' benefit and enrichment.

93.     As part of that scheme, Anderson, with the assistance of Defendant P. Williams, caused Tri-Med to transfer at least $350,000 to Defendant P. Williams from December 6, 2012, to April 25, 2013, for the purported purchase of medical accounts receivable.  Anderson knew that the accounts receivable purportedly sold from Defendant P. Williams to Tri-Med did not exist and were created and forged solely for the purpose of defrauding Tri-Med and its investors.

94.     As alleged herein, including in paragraphs 45-71, Defendant P. Williams knowingly provided substantial assistance to Anderson in connection with the scheme. Defendant P. Williams knew that the medical receivables were non-existent.  Indeed, Defendant P. Williams did not have the ability or authority to sell medical receivables.  Nevertheless, Defendant P. Williams accepted and endorsed each of the checks written from Tri-Med to him, which specifically noted that the payments were to purchase medical receivables that Defendant P. Williams knew did not exist.  Defendant P. Williams deposited the funds into accounts he controlled, including Defendant Apex and TMM.  Defendant P. Williams and Anderson then further misappropriated those amounts for a series of improper purposes to benefit themselves or entities in which they had an interest, including the operation of TMM and to fund renovations on Defendant Williams' personal residence in Minnesota.

95.     Tri-Med, as well as its investors, were damaged as a result of Anderson's and Defendant P. Williams' conduct.

WHEREFORE, the Receiver respectfully requests judgment against Defendant P. Williams for damages in an amount to be determined at trial as well as punitive damages, prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this Court deems just and proper.

## COUNT IV

**Aiding, Abetting, or Participation in Breaches of Fiduciary Duties – Defendant P. Williams**

96.      The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 71 of this Complaint as if set forth fully herein.

97.      Anderson and the other Tri-Med Principals owed fiduciary duties to Tri-Med and its investors.

98.      Anderson and the other Tri-Med Principals breached their fiduciary duties to Tri-Med and its investors as alleged herein (and particularly in paragraphs 45-71) by misappropriating and converting Tri-Med's funds for their own and others' use, by failing to use reasonable care in operating and managing the company, by failing to operate it in a reasonably prudent manner, and by failing to operate it in compliance with all applicable laws and regulations.

99.      Defendant P. Williams knew that Anderson owed a fiduciary duty to Tri-Med and its investors.  Defendant P. Williams also knew that Anderson was breaching his fiduciary duty to Tri-Med and its investors, including by knowing about the facts surrounding the Transfers.

100.      Defendant P. Williams knowingly or recklessly aided, abetted, or participated in these breaches of fiduciary duties by accepting and depositing each of the checks written from Tri-Med to him, which specifically falsely noted that the payments were to purchase medical

receivables. Defendant P. Williams knew that Anderson misappropriated the money for their benefit because the medical receivables did not exist.

101. Tri-Med and its investors were damaged as a result of Anderson's and Defendant P. Williams' conduct.

WHEREFORE, the Receiver respectfully requests judgment against Defendant P. Williams for damages in an amount to be determined at trial as well as punitive damages, prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this Court deems just and proper.

## COUNT V

### Conversion – Defendant P. Williams

102. The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 71 of this Complaint as if set forth fully herein.

103. Tri-Med owned, possessed, or had the right to immediate possession of personal property, including money.

104. Anderson and his co-conspirators wrongfully exercised dominion and control over such property by misappropriating and converting millions of dollars in such property from Tri-Med, thereby causing damages to Tri-Med, as well as to its investors.

105. By his conduct alleged herein, Defendant P. Williams participated in this misappropriation and conversion of at least $350,000 in Tri-Med property. Defendant P. Williams knowingly accepted and deposited each of the checks written from Tri-Med to him, which specifically falsely noted that the payments were to purchase medical receivables. Defendant P. Williams knew that Anderson converted the money for their benefit because the

medical receivables did not exist.  Indeed, a portion of these monies were used to fund Defendant P. Williams' business and to renovate his home.

106.    The wrongful conversion of property by Defendant P. Williams was the proximate cause of actual damages to Tri-Med and its investors.

WHEREFORE, the Receiver respectfully requests judgment against Defendant P. Williams for damages in an amount to be determined at trial as well as punitive damages, prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this Court deems just and proper.

## COUNT VI

### Aiding, Abetting, or Participation in Conversion – Defendant P. Williams

107.    The Receiver re-alleges each and every allegation contained in Paragraphs 1 through 71 of this Complaint as if set forth fully herein.

108.    Tri-Med owned, possessed, or had the right to immediate possession of personal property, including money.

109.    Anderson and his co-conspirators wrongfully exercised dominion and control over such property by misappropriating and converting millions of dollars in such property from Tri-Med, thereby causing damages to Tri-Med, as well as to its investors.

110.    By his conduct alleged herein, Defendant P. Williams knowingly aided, abetted, or participated in this misappropriation and conversion of at least $350,000 in Tri-Med property. Defendant P. Williams was aware that Anderson and his co-conspirators were wrongfully exercising dominion and control over Tri-Med's property.

111.    The wrongful conversion of property by Anderson and his co-conspirators was the proximate cause of actual damages to Tri-Med and its investors.

WHEREFORE, the Receiver respectfully requests judgment against Defendant P. Williams for damages in an amount to be determined at trial as well as punitive damages, prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this Court deems just and proper.

## COUNT VII

### Civil Conspiracy – All Defendants

112.    The Receiver re-allege each and every allegation contained in Paragraphs 1 through 68 of this Complaint as if set forth fully herein.

113.    Defendants conspired with Anderson to commit the wrongful conduct described herein, including breaches of fiduciary duties, participation in a fraudulent scheme, and conversion.  Defendant P. Williams, individually and on behalf of Defendant Apex, and Defendant K. Williams are responsible for all wrongdoing done by each of the other members of the conspiracy, including Anderson and others, in furtherance of the unlawful conspiracy and enterprise.  In particular, Defendants are responsible for Anderson's and his co-conspirators' misappropriation of millions of dollars in assets from Tri-Med.

114.    There was a meeting of the minds between Anderson, Nicholas Jr., Nicholas III, and others to defraud the investors.  This meeting of the minds grew to include other participants, including Defendant P. Williams, individually and on behalf of Defendant Apex, and Defendant K. Williams.  Defendant P. Williams joined the conspiracy and had a meeting of the minds with Anderson no later than December 2012 when he accepted and endorsed the $200,000 Check and deposited those funds into Defendant P. Williams' entity, Apex.

115.    Defendant K. Williams joined the conspiracy at the same time when she elected to become Chief Financial Officer of TMM where she knew or should have known of the improper

transfers and also began executing checks from TMM for improper purposes, including cash payments to Anderson and Defendant P. Williams, and for renovations to her home.  In this meeting of the minds, Defendant P. Williams and Defendant K. Williams agreed to assist Anderson and his co-conspirators with the fraud, by, among of things, assisting Anderson and others to misappropriate and convert Tri-Med's assets.

116.    Defendant P. Williams and Defendant K. Williams therefore knowingly combined together with Anderson and the co-conspirators in assisting Anderson perpetuate the fraud.

117.    As described herein (and particularly in paragraphs 45-71), Defendant P. Williams and Defendant K. Williams took various overt acts designed to assist Anderson in furtherance of the scheme, including accepting, endorsing and depositing the Transfers, and issuing checks for improper purposes.

118.    By doing so, Defendant P. Williams and Defendant K. Williams acted pursuant to their meeting of the minds with Anderson in pursuit of the common purpose of the conspiracy: to perpetuate a fraud upon Tri-Med and its investors.

119.    Defendant P. William's and Defendant K. Williams' conspiracy with Anderson and others to breach fiduciary duties, participate in a fraudulent scheme, and convert Tri-Med's property is a proximate cause of actual damages to Tri-Med and its investors.

120.    Defendant P. Williams' and Defendant K. Williams' actions in furthering the conspiracy to commit fraud were taken during the conspiracy's operation.

121.    Defendant P. Williams' and Defendant K. Williams' actions were part of a continuing activity that was illegal in nature and essential to furthering the survival of an ongoing fraudulent scheme.  But for the overt acts taken by members of the conspiracy to further the conspiracy's objectives as described herein, Anderson and his co-conspirators would not

have been able to execute the scheme and millions of dollars in damages to Tri-Med would have been avoided.

WHEREFORE, the Receiver respectfully requests a joint and several judgment against Defendants for damages in an amount to be determined at trial as well as punitive damages, prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this Court deems just and proper.

## NOTICE OF INTENT TO SEEK PUNITIVE DAMAGES

The actions of Defendants, as described in this Complaint, were intentional and/or grossly negligent and entitle Plaintiff to seek punitive damages.  Notice is hereby given that Plaintiff will, at the appropriate time, request the Court to include a claim for punitive damages in this case.

## JURY TRIAL DEMAND

The Receiver demands a jury trial on all claims.

Dated: December 5, 2016

                                    **BRIGGS AND MORGAN, P.A.**

                                    By:  /s/ Daniel J. Supalla
                                          Daniel J. Supalla (#0387064)
                                    2200 IDS Center
                                    80 South 8th Street
                                    Minneapolis, Minnesota 55402
                                    Phone:  612-977-8400
                                    Fax:  612-977-8650
                                    Email:  dsupalla@briggs.com

**WIAND GUERRA KING P.A.**

Gianluca Morello (Fl. Bar No. 034997)
Email: gmorello@wiandlaw.com
Michael S. Lamont (Fl. Bar No. 0527122)
Email: mlamont@wiandlaw.com
5505 West Gray Street
Tampa, FL  33609
Tel. 813-347-5100
Fax 813-347-5155

*Attorneys for the Receiver, Burton W. Wiand*